UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 23-20852-CV-WILLIAMS

ALLAN HERRERA ALONSO, *et al.*,

    Plaintiffs,

v.

GEICO GENERAL INSURANCE COMPANY,

    Defendant.
_____/

## ORDER

**THIS MATTER** is before the Court on the Motion for Summary Judgment (DE 29) ("***Motion***") filed by Defendant GEICO General Insurance Company ("***Defendant***" or "***GEICO***") to which Plaintiffs Allan Herrera Alonso ("***Mr. Herrera***") and Lourdes Herrera ("***Mrs. Herrera***"), assignees of Roger A. Garcia ("***Mr. Garcia Sr.***") and Roger S. Garcia ("***Mr. Garcia Jr.***"), assignors (collectively, "***Plaintiffs***") filed a Response (DE 47) ("***Response***"), and GEICO filed a Reply (DE 49) ("***Reply***").[1] For the reasons set forth below, GEICO's Motion is **GRANTED IN PART AND DENIED IN PART**.

**I.  BACKGROUND**

On the morning of February 28, 2018,[2] at or around the intersection of NW 36th Avenue and NW 82nd Street in Miami-Dade County, Florida, an automobile insured by

---

[1] In accordance with Southern District of Florida Local Rule 56.1, the Parties appropriately filed separate and contemporaneous Statements of Material Facts. *See* S.D. Fla. L.R. 56.1(a). The Court will cite to the GEICO's Statement of Material Facts (DE 28), Plaintiffs' Statement of Material Facts (DE 46), and GEICO's Reply Statement of Material Facts (DE 49).

[2] All dates, unless otherwise stated, occurred in the annual year of 2018.

Page **1** of **16**

GEICO and operated by Mr. Garcia Sr. was involved in a motor vehicle accident with a motorcycle operated by Mr. Herrera ("**Accident**"). (DE 28 at 1; DE 28-2 at 1, 4.) As a result of the Accident, Mr. Herrera sustained serious injuries, requiring him to be immediately transported to the trauma unit at Jackson Memorial Hospital ("**JMH**"). (DE 28-2 at 4–5.) At JMH, Mr. Herrera underwent numerous surgeries, including the amputation of his right leg. (DE 46 at 6; DE 47 at 2.)

That same day, GEICO received a notification of the Accident. (DE 28-3 at 55.) The next day, GEICO called and left a voicemail on Mr. Garcia Sr.'s phone in hopes to obtain additional information. (DE 28-3 at 55.) On March 7, after multiple unsuccessful calls to Mr. Garcia Sr., GEICO spoke to Ms. Margarita Ibarra ("**Ms. Ibarra**"), one of the named co-insureds under the GEICO auto-insurance policy ("**Auto Policy**"), who advised GEICO of the property loss and personal injury to Mr. Herrera. (DE 28-3 at 53–54.) After requesting and reviewing the corresponding State of Florida Traffic Crash Report ("**Crash Report**") memorializing the details of the Accident, GEICO advised Ms. Ibarra and Mr. Garcia Jr., the other co-insured under the Auto Policy, that GEICO found Mr. Garcia Sr. at fault for the Accident.[3] (DE 28-3 at 50–53.)

On March 16, GEICO initiated its first contact with Mr. Herrera by leaving a voicemail on his cell phone. (DE 28-3 at 45–47.) Three (3) days later, GEICO followed up with Mr. Herrera via mail correspondence delivered to his registered address with enclosed copies of a HIPPA Authorization and a Medicare Eligibility Form. (DE 28-6.) On March 20, Mrs. Herrera returned GEICO's initial phone call but was unable to reach a

---

[3] Mr. Garcia Sr. is not a named insured on the Auto Policy, but he was a permissive driver of the insured vehicle.

representative. (DE 28-3 at 44.) She left a voicemail explaining that Mr. Herrera was scheduled to begin a second surgery and that she and Mr. Herrera had been unable to speak with GEICO sooner. (DE 28-3 at 44.) Mrs. Herrera did not share her name or contact information in her voicemail. (DE 28-3 at 44.) By the end of that day, however, Tina Swindell ("**Ms. Swindell**"), a GEICO supervisor, directed the handing claims adjuster to verify Mr. Herrera's hospital room at JMH and to tender the Auto Policy's maximum $10,000 bodily injury limit to Mr. Herrera. (DE 28-3 at 42.)

On March 21, Peter Mixon ("**Mr. Mixon**"), the GEICO claims handler assigned to Mr. Herrera's claim, called Ms. Ibarra to update her on GEICO's decision to tender the maximum limit. (DE 28-3 at 35, 38.) Afterwards, Mr. Mixon also called and left a voicemail on Mr. Herrera's phone, stating that GEICO would pay him $10,000 and explaining the subsequent lien process GEICO must adhere to in order to ensure there were no outstanding medical bills for the services Mr. Herrera received at JMH. (DE 28-3 at 35, 38.) On March 22, a GEICO field representative visited JMH, attempting to deliver a $10,000 check to Mr. Herrera. (DE 28-3 at 34.) However, Mr. and Mrs. Herrera did not accept the $10,000 check because Mr. Herrera, at the time, believed that he and his wife had retained counsel to represent them on issues pertaining to the Accident. (DE 28-3 at 34.)[4] In this encounter with the Herreras, the GEICO field representative discovered that Mr. Herrera's right leg had been amputated. (DE 28-3 at 33–34.) Accordingly, Mr. Mixon

---

[4] Upon information that Plaintiffs may have retained counsel, Mr. Mixon contacted Plaintiffs' purported counsel who informed Mr. Mixon that he and his law office had not agreed to represent Mr. and Mrs. Herrera as of March 22. (DE 28-3 at 34.)

informed Ms. Ibarra of the increasing value of the claim and the lengthy settlement process that may ensue when hospital liens apply. (DE 28-3 at 33–34.)

After the first failed attempt to deliver the $10,000 check to Mr. Herrera, on March 23, the GEICO field representative returned to JMH and successfully delivered a proposed release form and the $10,000 check made co-payable to Mr. Herrera and JMH. (DE 28-3 at 33.) Later, following a conversation with Mr. Garcia Sr., GEICO amended the proposed release to include Mr. Garcia Jr. as an additional released party and subsequently delivered the amended proposed release to Mr. Herrera at his residence on March 27. (DE 28-3 at 26–27, 31–32.) By April 7, Mrs. Herrera mailed GEICO a letter explaining that she and her husband received the $10,000 check payable to Mr. Herrera and JMH but because Mr. Herrera's medical bills were covered by Medicaid, she would like for GEICO to re-issue the check without JMH's name on it. (DE 28-12.) In response, Mr. Mixon advised Mrs. Herrera that "Medicare" can hold liens based on medical services rendered at JMH and in order for GEICO to amend the check, the Herreras would need to provide documentation showing a lien satisfaction <u>or</u> a zero balance from JMH. (DE 28-3 at 23.) Notably, however, records indicate that Mr. Mixon redialed Mrs. Herrera thirty (30) minutes after initially speaking with her and left a voicemail clarifying his earlier statement to mean that a zero balance from Jackson "will be fine but [GEICO] will still need [a] Medicaid lien amount to reissue check." (DE 28-3 at 23.)

On April 17, Mrs. Herrera faxed GEICO a JMH Charge Summary for the purpose of proving that Mr. Herrera had a zero balance for the medical services rendered at JMH. (DE 28-12.) Mrs. Herrera did not enclose a release or any information about a lien satisfaction. Mr. Mixon followed up with Mrs. Herrera on May 14, leaving a voicemail on

Mrs. Herrera's phone and requesting the Herreras to call GEICO regarding the status of the Medicaid lien amount. (DE 28-3 at 23.) Four (4) days later, on May 18, Ms. Swindell directed Mr. Mixon to "send the [M]edicare notice letter to Medicaid please so [GEICO] can get them moving on pulling a Medicaid lien amount." (DE 28-3 at 22.) The Medicare letter was not sent to Medicaid, however, until June 11, twenty-four (24) days after Ms. Swindell's directive. (DE 28-3 at 22.) That same day, GEICO sent Mr. Herrera a Consent to Release ("**CTR**") Form designated for Medicare beneficiaries for the purpose of "prevent[ing] any undue delay in the settlement of the claim."[5] (DE 1-6 at 1; DE 28-3 at 22.)

On June 27, Mrs. Herrera purportedly sent a fourteen (14) paged fax to GEICO, including a handwritten letter that confirmed the Herreras received GEICO's June 12 correspondence, and stated, in relevant part, "my husband does not have [M]edicare . . . Jackson's bill had been paid by [M]edicaid. The Jackson bill does not show a lien. Please send us the check payable to us without Jackson on it. The Jackson bill attached is showing paid in full." (DE 1-7 at 1.) GEICO disputes whether it received all the faxed pages and asserts it only received the last five (5) pages of Mrs. Herrera's June 27 fax, containing an itemized JMH bill confirming a zero balance and Medicaid's payment of $17,549.13. GEICO acknowledged receiving the JMH bill but advised Mrs. Herrera that Defendant still required confirmation of any lien from Medicaid pursuant to applicable Florida law. (DE 28-3 at 20–21.) Additionally, GEICO advised Mrs. Herrera that if Mr. Herrera signed the CTR form, then GEICO would be able to obtain the necessary

---

[5] Although internal records indicate GEICO issued the CTR form on June 11, the date listed on the form docketed on the record is June 12. (DE 1-6.)

information directly from Medicaid. (DE 28-3 at 20–21.) Although Mrs. Herrera understood the effect of signing the CTR form, because the form included language that it was for a "Medicare beneficiary", she believed it was the wrong form for Mr. Herrera to sign and thought that the JMH bill showing a zero balance was sufficient. (DE 1-6 at 2; DE 28-10 at 102:19–104:6.) After speaking with Mr. Mixon about the CTR form again on July 17, Mrs. Herrera faxed GEICO a letter stating Mr. Herrera cannot sign the form because he was not a Medicare beneficiary. (DE 1-8 at 1.)

On July 17, Mr. Herrera sent a handwritten letter to the third-party recovery agency for the Medicaid program in Florida ("**Agency**") to confirm any Medicaid lien amount. (DE 28-16.) The next communication between GEICO and the Herreras would not occur until September 10. (DE 28-3 at 19.) In Mrs. Herrera's phone conversation with Mr. Mixon, she reiterated that Mr. Herrera could not sign the CTR form because the form references Medicare. According to GEICO, Mr. Mixon then advised Mrs. Herrera that Medicare and Medicaid were a common agency for the purpose of confirming any lien amount in Florida. Despite admissions that GEICO commonly utilized the same CTR form for both Medicare and Medicaid liens at the time, Plaintiffs dispute whether such a form would have been proper and allowed Medicaid to release the lien amount to GEICO. (DE 28-8 at 109:2–13; DE 28-18 at 14:11–18:10.)

On October 4, Mr. Herrera faxed his second handwritten letter to Agency, enclosing a signed Medicaid Authorization form. (DE 28-19.) Later that month, Mr. Herrera also signed and returned the CTR form to GEICO, which Mr. Mixon subsequently faxed to the Agency. (DE 28-3 at 17; DE 28-20.) On November 6, Conduent Payment Integrity Solutions ("**Conduent**"), the authorized agent for the Agency, sent

correspondence to the Herreras, confirming a Medicaid lien in the amount of $24,105.89. (DE 28-21 at 4.) In a second fax, Conduent clarified:

> [i]f the total settlement amount is $10,000 then we will take half of the settlement amount and the other half belongs to the recipient. We will need either a copy of the check and the general release signed and dated by the recipient accepting the offer and will send the final.

(DE 28-21 at 9.) On November 7, Mrs. Herrera faxed the Conduent's correspondence as well as a handwritten letter to GEICO, requesting a $5,000 check payable to Mr. Herrera within fourteen (14) days. (DE 1-13.) Although GEICO disputes for a second time whether it received all the pages included in Mrs. Herrera's fax, notably the handwritten letter requesting a $5,000 check, GEICO accepts that it did receive pages featuring the Conduent's correspondence; accordingly, Mr. Mixon called the Conduent and confirmed the amount of the Medicaid lien, and that Medicaid would accept $5,000 to satisfy its lien. (DE 28-3 at 16.)

According to GEICO, Conduent required Mr. Herrera to sign the release of liability waiver before Conduent would reduce the lien amount to $5,000 and accept half of the policy limits from GEICO in satisfaction of the Medicaid lien. (DE 28 at 8.) As such, GEICO requested Mr. Herrera send the signed release, before GEICO would issue the separate $5,000 checks payable to Mr. Herrera and Medicaid. (DE 1-14; DE 1-15.) Alternatively, Mrs. Herrera requested GEICO send the $5,000 check payable to Mr. Herrera before the Herreras would agree to sign and submit any release discharging the Garcias from additional liability. (DE 28-10 at 165:1–20.)

By the beginning of December, Mr. Herrera had not signed the release and GEICO had not issued a $5,000 check. Accordingly, Mr. and Mrs. Herrera filed a tort action against Mr. Garcia Sr. and Mr. Garcia Jr. in the Eleventh Judicial Circuit, in and for Miami-Dade County, Florida on December 3, 2018 ("***Underlying Action***").[6] At the conclusion of the Underlying Action, on September 22, 2022, the parties agreed to the entry of final judgment in the amount of $5.5 million against the Garcias. Plaintiffs subsequently brought this suit alleging one (1) claim of common law bad faith against GEICO. Following the completion of discovery, GEICO now moves for summary judgment pursuant to Federal Rule of Civil Procedure 56 ("***Rule 56***"). (DE 29 at 1.)

## II. LEGAL STANDARD

### A. Summary Judgment

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "[O]nly disputes over facts that might affect the outcome of the suit under the governing [substantive] law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 447 U.S. 242, 248 (1986). Any such dispute is "genuine" only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In evaluating a motion for summary judgment, the Court considers the evidence in the record, "including depositions, documents, electronically stored information, affidavits,

---

[6] The Underlying Action is styled, *Allan Herrera Alonso and Lourdes Herrera v. Roger A. Garcia and Roger S. Garcia*, Case No. 2018-040215-CA-01.

or declarations, stipulations . . . , admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). The party seeking summary judgment carries the burden of "informing the district court of the basis for this motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. "To discharge this burden, the movant must point out to the Court that there is an absence of evidence to support the nonmoving party's case." *Feinman v. Target Corp.*, 2012 WL 6061745, at *3 (S.D. Fla. Dec. 6, 2012) (citing *Celotex*, 477 U.S. at 325). Once the movant satisfies their burden, the burden of production shifts to the non-moving party, which must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsuchita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

    The Court "must view all the evidence and all factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party and must resolve all reasonable doubts about the facts in favor of the non-movant." *Rioux v. City of Atlanta*, 520 F.3d 1269, 1274 (11th Cir. 2008) (quotations, citations omitted). However, "[t]he mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252; *see also Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990). Evidence that is "merely colorable" or "not significantly probative" is insufficient to defeat a motion for summary judgment. *Anderson*, 477 U.S. at 249–50. At the summary judgment stage, the Court's task is not to "weigh the evidence and

determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249.

### B. Common Law Bad Faith Claims in Florida

A federal district court sitting in diversity must apply the substantive law of the forum state. *Ilias v. USAA Gen. Indem. Co.*, 61 F.4th 1338, 1344 (11th Cir. 2023). In Florida, an insurer has the duty to handle the defense of claims against its insured in good faith. *Berges v. Infinity Ins. Co.*, 896 So. 2d 665, 668–69 (Fla. 2004). An insurer who breaches the duty to act in good faith may be held liable in a bad-faith action. *Perera v. U.S. Fid. & Guar. Co.*, 35 So. 3d 893, 898 (Fla. 2010). Moreover, Florida courts afford injured third parties with the right to bring a cause of action for bad faith directly against an insurer.[7] *Id.* at 898–99. ("Under Florida law, it is clear than insured or a third-party claimant may bring a third-party bad-faith cause of action when an insurer has breached its duty of good faith and that breach results in an excess judgment being entered against its insured.") (citation omitted).

According to the Florida Supreme Court, an insurer's duty to act in good faith involves obligations to advise the insured of settlement opportunities, to advise as to the probable outcome of litigation, to warn of the possibility of excess judgment, and to advise the insured of the steps he might take to avoid an excess judgment. *Boston Old Colony Ins. Co. v. Gutierrez*, 386 So. 2d 783, 785 (Fla. 1980). In accordance with its duty, insurers are to "investigate the facts, give fair consideration to a settlement offer that is not unreasonable under the facts and *settle*, if possible, where a reasonably prudent person,

---

[7] In Florida, individuals can also bring first-party bad faith actions against insurers under Florida Statutes Section 624.155. *See* Fla. Stat. § 624.155(1)(b)(1); *Macola v. Gov't Emps. Ins. Co.*, 953 So. 2d 451, 454–56 (Fla. 2006).

faced with the prospect of paying total recovery, would do so." *Id.* (emphasis added). In sum, this duty requires an insurer to handle claims against its insured with "the same degree of care and diligence as a person of ordinary care and prudence should exercise in the management of his own business." *Id.* "The essence of an insurance bad faith claim is that the insurer acted in its own best interests to the detriment of the insured; the insurer failed to act timely and thereby exposed the insured to an excess judgment." *Johnson v. GEICO Gen. Ins. Co.*, 318 Fed. App'x 847, 849 (11th Cir. 2009).

In bad faith cases, the critical inquiry is whether the insurer diligently, and with the same haste and precision as if it were in the insured's shoes, worked on the insured's behalf to avoid an excess judgement. *Harvey v. GEICO Gen. Ins. Co.*, 259 So. 3d 1, 7 (Fla. 2018). The question of whether an insurer has acted in bad faith in handling claims against the insured is determined under the totality of the circumstances standard. *Id.* Each case is determined on its own facts and ordinarily the question of failure to act in good faith with due regard for the interests of the insured is for the jury to resolve. *Berges*, 896 So.2d at 668; *Moore v. GEICO Gen. Ins. Co.*, 633 Fed. App'x 924, 928 (11th Cir. 2016) (noting that the inherently flexible nature of the "totality of the circumstances" standard renders a bad faith claim unsuitable for summary disposition).

III. DISCUSSION

Here, disputed factual issues preclude a grant of summary judgment. In reviewing the evidence most favorably to Plaintiffs, GEICO's timeliness and diligence in resolving all impediments thwarting the settlement negotiations with Mr. Herrera, most notably, the confirmation of the Medicaid lien amount and the issuance of separate $5,000 checks

payable to Mr. Herrera and Medicaid, could lead a reasonable jury to find that GEICO acted in bad faith.

Despite the pertinent fact that the claim did not settle, GEICO maintains its argument that it took all steps to protect its insureds from excess exposure. It is undisputed GEICO had a duty to act with "care and diligence" in handling the defense of claims asserted against its insureds. *Boston Old Colony*, 386 So. 2d at 785. The record reveals GEICO understood its duty because within one (1) week of the motor vehicle accident GEICO investigated and concluded Mr. Garcia Sr. was at fault for the Accident. Furthermore, within twenty (20) days of the Accident, GEICO discovered Mr. Herrera's contact information, reviewed the basic extent of his injuries and even delivered a $10,000 check co-payable to Mr. Herrera.

While it is undisputed that GEICO investigated the facts of the Accident, offered potential settlements, and repeatedly called its insureds to explain and advise them on the settlement process, the Court finds there is still sufficient disputed evidence that supports the conclusion that GEICO acted in bad faith. *Harvey*, 259 So. 3d at 7 (discussing how insurers are not absolved of liability simply because, among other things, it advised its insured of settlement opportunities). In Florida, courts have affirmed that bad faith may be inferred from a *delay* in settlement negotiations which is willful and without reasonable cause. *Powell v. Prudential Prop. & Cas. Ins. Co.*, 584 So. 2d 12, 14 (Fla. 3d Dist. Ct. App. 1991) (emphasis added). Particularly, in such a case, where "the financial exposure to the insured is a ticking financial time bomb and suit can be filed at any time," any "delay in making an offer . . . could be viewed by a fact finder as evidence of bad faith." Harvey, 259 So. 3d at 7; *see also Ilias*, 61 F.4th at 1345 (quoting *Powell*, 584 So.

2d at 14) ("Where liability is clear and injuries so serious that a judgment in excess of the policy limits is likely, an insurer has an affirmative duty to initiate settlement negotiations.").

Here, upon discovery that Mr. Herrera had his right leg amputated as result of the Accident, GEICO knew the gravity of Mr. Herrera's loss and the severity of its insureds' financial exposure. In fact, GEICO knew the full extent of Mr. Herrera's injury within a month of receiving notice of the Accident.[8] Yet, Mr. Herrera's claim remained active and unsettled for approximately nine (9) additional months, through the time Mr. and Mrs. Herrera initiated a tort action against Mr. Garcia Sr. and Mr. Garcia Jr., resulting in the final judgment totaling $5.5 million.

Disputed facts in the record demonstrate that there was a delay in settling Mr. Herrera's claim.[9] Beyond repeated gaps in communication between GEICO and Mrs. Herrera,[10] a delay arose between March and May when the Parties dispute whether proof

---

[8] Mr. Mixon, the adjuster assigned to Mr. Herrera's claim, was aware of the severity of Mr. Herrera's loss at the time his supervisor instructed him to submit a form directly to Medicaid, requesting the necessary information regarding any lien amount Medicaid may have had against Mr. Herrera. Mr. Mixon did not send the request to Medicaid until three (3) weeks later.

[9] GEICO argues Mrs. Herrera demonstrated an unwillingness to settle, which led to the delay in resolving Mr. Herrera's claim. (DE 29 at 4.) While the claimant's unwillingness to settle is relevant under the totality of the circumstance standard, Florida law is clear that "the focus in a bad faith case is not on the actions of the claimant but rather on those of the insurer in fulfilling its obligations to the insured." *Harvey*, 259 So. 3d at 10. Additionally, Mrs. Herrera's willingness to settle the claim remains in dispute given that GEICO contends that it did not receive missing pages in Mrs. Herrera's June 12 and November 7 faxes, including Mrs. Herrera's handwritten letters in which she asked GEICO to send a check payable to Mr. Herrera to resolve the claim.

[10] The record confirms that, at various points, Mrs. Herrera did not answer a number of telephone calls from GEICO and GEICO was occasionally unable to leave a message on her phone due to issues with her voicemail. Likewise, evidence reveals there were multiple instances when GEICO did not call or follow up on the status of Mr. Herrera's

a JMH zero balance was sufficient to permit GEICO to reissue a $10,000 check payable to Mr. Herrera. Then, between May and November, the Parties dispute whether the CTR form GEICO sent Mrs. Herrera was the appropriate form for Mr. Herrera to sign and submit as a Medicaid beneficiary despite the form designating its intended use being for a Medicare beneficiary. Finally, a delay also arose between November and December when the Parties dispute whether Conduent required GEICO to reissue the checks first or Mr. Herrera to sign the release first before Conduent would agree to reduce the lien amount to $5,000 and accept GEICO's payment in full satisfaction.

In addition to seeking summary judgment on Plaintiffs' third-party bad faith claim, GEICO alternatively moves for partial summary judgment on two issues. First, GEICO argues it had no reasonable opportunity to settle Mr. Herrera's claim after December 3, the date Mr. and Mrs. Herrera initiated their tort action against Mr. Garcia Sr. and Mr. Garcia Jr. (DE 29 at 19–20.) Plaintiffs do not oppose partial summary judgment as Plaintiffs do not dispute their unwillingness to settle after they filed the tort action.[11] Accordingly, because there is no genuine dispute as to any material fact on this issue,

---

claim for weeks and at least one period when GEICO did not communicate with Mrs. Herrera for approximately six (6) weeks.

[11] Plaintiffs argue it would be more appropriate for the Court to resolve this narrow issue on the Parties' motions *in limine*. Although the Court notes that GEICO filed an unopposed Motion *in Limine* (DE 33) on this particular issue, the Court will grant partial relief pursuant to Rule 56(a) of the Federal Rules of Civil Procedure.

the Court will grant partial summary judgment on GEICO's conduct after December 3, 2018.

With regard to the second issue, GEICO contends that its communications, or lack of, with the Garcias had no causal connection to Mr. and Mrs. Herrera's excess judgment. (DE 29 at 20.) The Court disagrees and denies partial summary judgment as the Parties dispute material facts relevant in determining any causal nexus between the excess judgment and GEICO's communications, or lack of, with the Garcias. (DE 46-2 at 28:1–17, 30:7–20.)  In light of the varying accounts of what information GEICO did or did not provide to the Garcias, a determination on the causal nexus would be inappropriate for the Court to decide at summary judgment. *Strickland v. Norfolk S. Ry. Co.*, 692 F.3d 1151, 1154 (11th Cir. 2012) ("Credibility determinations, the weighing of the evidence, and drawing legitimate inferences from the facts are jury functions, not those of a judge . . ."); *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1253 (11th Cir. 2013) ("As a general principle, a plaintiff's testimony cannot be discounted on summary judgment unless it is blatantly contradicted by the record . . . .").

## IV.    CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED** that GEICO General Insurance Company's Motion for Summary Judgment (DE 29) is **GRANTED IN PART AND DENIED IN PART** as follows:

1. The Motion is denied with respect to GEICO's conduct on and before December 3, 2018.

2. The Motion is granted with respect to GEICO's conduct after December 3, 2018.

3. The Motion is denied with respect to GEICO's communications, or lack of, with Mr. Garcia Sr. and Mr. Garcia Jr.

**DONE AND ORDERED** in Chambers in Miami, Florida on this 25th day of April, 2024.

KATHLEEN M. WILLIAMS
UNITED STATES DISTRICT JUDGE